CHUTZ, J.
| gDefendants-appellants, James Carrol “T.J.” Henry Jr., his employer, Frisco Construction Company (Frisco Construction), and their liability insurer, The Gray Insurance Company, appeal the trial court’s judgment, incorporating the jury’s verdict, which found Henry 100 percent at fault and awarded damages to plaintiffs-appellees, Barry and Lori Pennison, for the personal injuries they suffered when Barry was involved in a motorcycle accident. Defendants also appeal a partial summary judgment rendered by the trial court on the issue of Henry’s fault but expressly reserved for the jury’s determination the percentage, if any, of comparative fault for which Barry may have been responsible. We affirm.
FACTUAL AND PROCEDURAL BACKGROUND
Barry sustained serious injuries when the 2007 Harley Davidson motorcycle he was riding south on La. Highway 57, Grand Calliou Road, in Terrebonne Parish crashed into a pick-up truck parked in the Frisco Construction industrial yard. The Pennisons filed this lawsuit averring that as Henry, who was driving a Frisco Construction 2009 Dodge 1500 Ram pick-up truck, attempted to turn left into the Frisco Construction yard, he crossed the cen-terline into Barry’s lane of travel, causing Barry to leave the roadway and crash.[2]
After defendants answered the lawsuit and discovery was conducted, the Penni-sons filed a motion for summary judgment, asserting Barry was free from fault and Henry was 100 percent at fault in causing the accident. The trial court agreed that Henry was at fault, but declined to address any apportionment of the percentage of ' fault attributable to him; or to conclude that Barry was not also comparatively at fault. Defendants’ attempt to devolutively appeal the trial court’s grant of partial summary judgment in favor of the Penni-sons, finding that Henry was at fault in Iscausing the accident, was denied. In denying the order for devolutive appeal, the trial court wrote in longhand:
The court’s ruling was not a final judgment nor designated as a final partial judgment. The court expressly reserved the apportionment of fault for the jury to decide in addition to ruling on other evidentiary issues. In addition, *1071 other evidentiary issues must be resolved prior to trial.
Defendants did not seek review of the trial court’s denial of their devolutive appeal.
After additional discovery, the Penni-sons filed another motion for summary judgment, this time contending entitlement to a finding that Barry was free from fault. The trial court denied the motion, and the matter proceeded to trial before the jury.
After a seven-day trial, the jury rendered a verdict in favor of the Pennisons. The jury found that Henry was a cause of the accident and Barry was not negligent; apportioned “100%” fault to Henry and “0%” to Barry; and awarded the Penni-sons damages totaling $4,200,000.00.
On November 22, 2013, the trial court issued a judgment in conformity with the jury’s verdict from which defendants have suspensively appealed. On appeal, defendants contend that the trial court erred as a matter of law when it granted a partial summary judgment on the issue of Henry’s fault. Additionally, defendants challenge the trial court’s awards of general damages, future medical expenses, and past and future loss of income to Barry, as well as the loss of consortium award to Lori.
PROPRIETY OF THE GRANT OF PARTIAL SUMMARY JUDGMENT
Maintaining that as part of an unbridled appeal of the trial court’s final judgment they are permitted to challenge earlier interlocutory rulings, see Landry v. Leonard J. Chabert Med. Ctr., 2002-1559 (La.App. 1st Cir.5/14/03), 858 So.2d 454, 461 n. 4, writs denied, 2003-1748 and 2003-1752 (La.10/17/03), 855 So.2d 761, defendants assert that the trial court erred when it granted partial summary judgment on the issue of Henry’s liability prior to the trial on the merits.
A motion for summary judgment is a procedural device used to avoid a full-scale trial when there is no genuine issue of material fact. All Crane Rental of Georgia, Inc. v. Vincent, 2010-0116 (La.App. 1st Cir.9/10/10), 47 So.3d 1024, 1027, writ denied, 2010-2227 (La.11/19/10), 49 So.3d 387. Summary judgment is properly granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, admitted for purposes of the motion for summary judgment, show that there is no genuine issue of material fact, and that mover is entitled to judgment as a matter of law. La. C.C.P. art. 966(B)(2).
In ruling on a motion for summary judgment, the trial court’s role is not to evaluate the weight of the evidence or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. Gros v. Boisvert Farms, LLC, 2013-0016 (La.App. 1st Cir.2/27/14), 142 So.3d 991, 995. The trial court cannot make credibility determinations, evaluate testimony, or weigh conflicting evidence in making a decision whether to grant or deny a motion for summary judgment. Pumphrey v. Harris, 2012-0405 (La.App. 1st Cir.11/2/12), 111 So.3d 86, 91.
Defendants contend that this court’s decisions in Tye v. Co-Mar Offshore Operators, Inc., 95-0094 (La.App. 1st Cir.10/6/95), 669 So.2d 438, 440, writ denied, 96-1051 (La.6/7/96), 674 So.2d 975 and Saba v. Hosp. Housekeeping Systems, Ltd., 2007-0916 (La.App. 1st Cir.12/21/07), 2007 WL 4480677 (unpublished opinion), mandate a reversal of the trial court’s imposition of liability. They suggest that as such, legal error has interdicted the fact finding process and, therefore, we must conduct a de novo review of the evidence.
*1072 Citing the fourth circuit’s decision in Williams v. City of New Orleans, 93-2043 (La.App. 4th Cir.5/17/94), 637 So.2d 1130, 1131-32, writ denied, 94-1587 (La.10/7/94), 644 So.2d 632, in a review of a trial court’s grant of a partial summary judgment on the issue of res judicata, relying on an earlier version of La. C.C.P. art. 966, this court recognized that a partial summary judgment could be granted on the issue of liability alone when a genuine issue as to the amount of damages remained to be decided at a trial on the merits.[3] But the court held that a partial summary judgment could not be granted for purposes of determining a particular element of liability where such a determination was not completely dispositive of the question of liability between the parties concerning that claim and where other issues such as comparative fault remained unresolved. Tye, 669 So.2d at 440; accord Saba, 2007-0916 at p. 3.
Unlike the judgments under review in Tye and Saba, we review a challenge of the trial court’s interlocutory ruling raised alongside defendants’ appeal of the final judgment that resolved all issues between the parties, because defendant did not seek a review of the trial court’s denial of their attempt to devolutively appeal the partial grant of summary judgment and did not apply for a supervisory writ. Instead, they chose to wait until the conclusion of the case to raise the alleged error in the trial court’s interlocutory ruling. Where a partial summary judgment does not address all elements of liability, it is not a true final judgment but is one that was ostensibly improperly (untimely) rendered as opposed to one that was improperly (incorrectly) decided. See Williams, 637 So.2d at 1133.
Without regard to whether by granting the partial summary judgment before the trial on the merits the trial court untimely rendered judgment, preliminarily we review whether the grant of a partial summary judgment on the issue of defendants’ [ pliability was incorrectly decided. In their motion for summary judgment, the Pennisons asserted that Henry was presumed at fault because the evidence they offered established that while maneuvering a left turn, he crossed over the center line into Barry’s favored lane of travel. They contended that defendants could offer no evidence to the contrary.
The jurisprudence has established that a left turn is generally a dangerous maneuver which must not be undertaken until the turning motorist ascertains that the turn can be made in safety. A high degree of care is required of a left-turning motorist. A left-turning motorist involved in an accident is burdened with a presumption of liability, and the motorist must show that he is free of negligence. An oncoming motorist has a right to assume that a left-turning motorist will yield the right-of-way. Dakmak v. Baton Rouge City Police Dep’t, 2012-1468 (La.App. 1st Cir.9/4/14), 153 So.3d 498, 504.
On the showing made at the hearing on the motion for summary judgment,, including the deposition testimony of Barry, Henry, Christopher “Red” Wilson, and Emile Hotard, Jr. (all of which was essentially in conformity with their trial testimo *1073 ny as outlined below unless noted otherwise), we find that the trial court did not incorrectly decide that Henry bore a portion of liability. Likewise, a review of all the evidence admitted at the trial on the merits supports a finding that Henry was some percentage at fault.
Barry testified he left his house on October 1, 2010, around 1:30 p.m. As he approached the Frisco Construction industrial yard heading south, he slowed his motorcycle from 45 miles per hour to between 20 and 25 miles per hour, in conformity with the posted speed limit. He was familiar with the area and aware that there was often a lot of activity happening there. Barry said he saw Henry’s truck in the northbound lane, but there was nothing special about it. He did not recall having seen a left-turn signal illuminated, but he admitted that it could have been. |7When Henry’s truck crossed the yellow line, Barry stated he was close enough to have touched the vehicle. He immediately exercised evasive action by crossing the white fog fine to his right toward the Frisco Construction yard. While trying to maneuver between Henry’s truck and another blue truck parked in the Frisco Construction yard, Barry encountered loose gravel and began to slide, causing the motorcycle’s crash bars to strike the front end of the blue truck. As a result, Barry flew off the motorcycle, landing on his groin, and sustained such serious injuries that he had to be evacuated by air to a local hospital. Barry described the accident as having occurred in the snap of a finger. He had no advance notice that Henry was going to pull out in front of him until immediately before his motorcycle and the truck were about to collide. Barry testified that he did not have time to apply his brakes to-avoid the accident.
Henry’s testimony was also adduced at trial. He recalled that he was driving the company truck northbound on Highway 57 to the Frisco Construction yard. A lot of activity was happening in the yard. An 18-wheeler had backed up and workers were offloading material from the truck onto a barge using a crane crawler with a boom. Henry stated that he slowed down, looking behind him as he did so, and saw nothing. He then looked ahead but did not see anything coming. Henry admitted that he only looked to the north the one time. Henry then focused his attention on the yard, trying to avoid people and equipment as he searched for a place to park. He stated that he put his blinker on and was traveling between 2 and 5 MPH as he crossed the yellow center line. He recalled that his passenger, Wilson, either hit him on the shoulder or hollered at him, trying to get his attention. Henry first observed the motorcycle after Wilson alerted him. He then looked up and saw Barry approaching. Henry described the duration between his first observation of Barry and his return back into the northbound lane of travel as instantaneous.
IsAccording to the testimony of Henry’s passenger, Wilson, Barry did everything he could have done to avoid the accident. Like Henry, Wilson was focused on the activity in the yard as Henry started to move into the southbound lane of traffic where Barry was driving. Wilson stated that he did not look north as Henry started to turn left; he was concentrating on the yard. When Barry was close, Wilson saw him and-warned Henry twice. Wilson could not recall whether Henry had put his signal on before turning.
The jury also heard the testimony of Manny Tanner, a Frisco Construction employee, who was on the bed of the backed-in 18-wheeler at the time of the accident. He also described that a lot of activity was occurring in the yard. Tanner saw Henry and Wilson in the company truck before *1074 the accident. He witnessed Wilson hit Henry’s left arm, ostensibly warning the driver of Barry’s presence. According to Tanner, the events happened very quickly. The time between Henry’s turn and Barry’s swerve to avoid the truck was fast: “a second” or somewhere around “a millisecond.” Tanner stated there was no time for Barry to stop. He recounted a comment Henry made to him after the accident, indicating that Henry “just honestly said he did not see him, see the motorbike ... until it was too late.”
Defendants relied heavily on the testimony of Hotard, a Frisco Construction employee, who was in front of the 18-wheeler when he saw Henry attempting to park in the yard. According to defendants, Hotard’s testimony established that Barry had ample time to stop to avoid the accident. But Hotard’s testimony both in court and at his deposition was equivocal. Hotard explained that he knew the Penni-sons because his daughter is married to their son. He also knew the defendants because one owner of Frisco Construction is Hotard’s first cousin, another is a lifelong friend, and Henry was a co-worker. Hotard confirmed that at the time of the accident, there was a lot of activity and it was noisy in the Frisco Construction yard.
| sHotard recalled that when he first saw the Frisco Construction truck, Henry had already crossed the yellow center line and was in the southbound lane, which is where he was the entire time he observed Henry before the accident. Hotard stated that Henry was looking into the yard, and neither Henry nor Wilson was looking north. Hotard realized something was about to happen when, as he looked south at Henry, he heard the motorcycle and then two horn beeps from the motorcycle. Although at trial he described the timing of the horn beeps as one right after the other and “almost the same” horn, in his earlier deposition testimony, Hotard had described a longer lapse of time between the two beeps.
Hotard’s placement of the motorcycle upon his first recognition was also equivocal in his trial testimony. He pointed out on a photograph the area where he thought he was and where he believed the motorcycle to have been when he first saw it but indicated he was not certain. Ho-tard admitted that his attempts to place traffic cones to recreate events for defendants’ expert two-and-a-half years after the accident were also unreliable.
According to Hotard, between the moment he noticed Henry and the time he saw Barry’s motorcycle going off the road, there was “no time right here”; it was very quick; a little longer than a snap of the fingers. Like Wilson and Tanner, Ho-tard also stated that he did not see anything that Barry could have done to avoid the accident.
Despite the equivocation of Hotard’s testimony on some points, all the testimony of the eyewitnesses, including Hotard’s, supports the finding that Henry was turning left, failed to see what he should have seen and yield the right-of-way. As such, there was no conflicting evidence as to Henry’s liability introduced either at the motion for summary judgment hearing or at the trial on the merits. The record is replete with evidence to support the trial court’s decision on the motion for partial summary judgment that Henry was some percentage at fault. Based on the evidence | inboth at the hearing and at trial, there simply was no conflicting evidence for the trier of fact to weigh on the issue of Henry’s liability so as to support any finding other than that Henry was not free from fault. See Pumphrey, 111 So.3d at 91. Thus, the trial court correctly decided the issue of Henry’s fault.
*1075 Addressing now whether the trial court timely rendered the partial summary judgment, we conclude that any error was not prejudicial so as to warrant a de novo review of the evidence. Error is prejudicial when the error is material and, when compared to the record in its totality, it has a substantial effect on the outcome of the case. Prejudicial error is reversible error. Error that is not prejudicial is harmless error and is not reversible error. See Duzon v. Stallworth, 2001-1187 (La.App. 1st Cir.12/11/02), 866 So.2d 887, 861, writ denied sub nom., Duzon ex rel. Cmty. of Acquiets & Gains v. Stallworth, 2003-0589 (La.5/2/03), 842 So.2d 1101, writ denied, 2003-0605 (La.5/2/03), 842 So.2d 1110.
Our review of the record convinces us that defendants have never averred that Henry was free from fault.[4] Even on appeal as they claim entitlement to a de novo review based on the error they aver is a legal one, defendants acknowledge that Henry was at least 50 percent at fault. The record clearly establishes a substantial amount of evidence to support the imposition of liability against defendants for Henry’s fault. And defendants have not truly disputed that Henry bears some percentage of fault. Moreover, defendants chose to challenge the trial court’s partial In summary judgment determination on appeal of the final judgment after the trial on the merits rather than seeking supervisory review at the time of rendition of the partial summary judgment, which had the effect of delaying the time for correction of any alleged error. Therefore, we conclude that defendants have failed to show a material error by any untimely grant of partial summary judgment by the trial court in this case.
While defendants complain on appeal that the trial court somehow prejudiced them by requiring that they put on their expert evidence of Barry’s liability during their case in chief and allowing the Pennisons to submit expert evidence of causation in their rebuttal case (rather than during their case in chief), we find this complaint is without merit. First, it was defendants’ burden to establish comparative fault. See Trinh ex rel. Tran v. Dufrene Boats, Inc., 2008-0824 (La.App. 1st Cir.1/22/09), 6 So.3d 830, 844, cert. denied, 558 U.S. 875, 130 S.Ct. 228, 175 L.Ed.2d 128 (2009). Second, the trial judge has much discretion in conducting a trial. He is required to do so in an orderly, expeditious manner and to control the proceedings so that justice is done. See La. C.C.P. art. 1631. The judge’s discretion includes the order of presentation of witnesses as well as the admissibility of a witness’s testimony. See La. C.C.P. arts. 1631 and 1632. We find no abuse of the trial court’s discretion in this case. See Pino v. Gauthier, 633 So.2d 638, 648 (La.App. 1st Cir.1993), writs denied, 94-0243 *1076 (La.3/18/94), 634 So.2d 858 and 94-0260 (La.3/18/94), 634 So.2d 859. Therefore, defendants have failed to show prejudice on this basis.
To the extent that the trial court untimely rendered partial summary judgment prior to the trial on the merits in error, it is not a material error and, when compared to the record in its totality, it did not have a substantial effect on the outcome of the Incase.[5] Accordingly, a de novo review of the evidence is not warranted.[6]
APPORTIONMENT OF FAULT
Defendants, in the alternative, have asserted that the jury’s apportionment of fault was manifestly erroneous. There is ample evidence to support the imposition of liability as determined by the jury. Specifically in this case, because a trier of fact is free to believe in whole or part the testimony of any witness, see Scoggins v. Frederick, 98-1814 (La.App. 1st Cir.9/24/99), 744 So.2d 676, 687, writ denied, 99-3557 (La.3/17/00), 756 So.2d 1141, the jury was free to disregard those portions of Hotard’s testimony that supported defendants’ motor vehicle accident reconstruction and traffic engineering expert, Doug Roberts’ conclusions.
|]3Based on Hotard’s recollection of having heard the motorcycle’s horn twice and his equivocal placement of the location of *1077 the motorcycle upon hearing the horn, Roberts calculated Barry's braking distance on the supposition that two seconds had passed between the first horn beep and the near-accident between Barry and Henry’s truck. Roberts opined that this lapse of time demonstrated that Barry had time to see the potential danger and either slow down or brake to avoid an accident. But Hotard was the only person in the vicinity of the noisy industrial yard who heard the horn sound from Barry’s motorcycle. And his testimony was not clear on either the amount of time that passed between his hearing the motorcycle horn and seeing Barry, or on where Barry’s motorcycle was located when Hotard observed him traveling south on Highway 57 after having heard the horn beep. The remaining testimonial evidence supports the jury’s implicit findings that Henry made a sudden turn to his left (toward the west) in front of Barry and that the motorcyclist turned his bike to the west, toward the Frisco Construction yard, in an attempt to avoid a collision with Henry’s truck. Thus, a reasonable factual basis exists to support the jury’s finding that Henry was the sole cause of the accident and, therefore, the apportionment of 100 percent fault to Henry was not manifestly erroneous. See Watson v. State Farm Fire and Cas. Ins. Co., 469 So.2d 967, 974 (La.1986); Stobart v. State, Dep’t of Transp. and Dev., 617 So.2d 880, 882-88 (La.1993). For these reasons, the trial court correctly incorporated the jury’s apportionment of 100 percent fault to defendants.
DAMAGES
Defendants contest many of the jury’s awards of damages, suggesting they were excessive. The jury awarded $975,000.00 in general damages[7] to Barry and |14$150,000.00 in loss of consortium damages to Lori. It also concluded that Barry was entitled to $85,000.00 for future medical expenses, $600,000.00 in past loss of income/profits, and $2,200,000.00 in future loss of income/profits.[8] We examine the propriety of each award in turn.

General Damages:

The trier of fact is accorded much discretion in' fixing general damage awards. La. C.C. art. 2324.1; Cheramie v. Horst, 93-1168 (La.App. 1st Cir.5/20/94), 637 So.2d 720, 723. The discretion vested in the trier of fact is “great,” even vast, so that an appellate court should rarely disturb an award of general damages. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994).
The role of an appellate court in reviewing general damages is not to decide what it considers to be an appropriate award but, rather, to review the exercise of discretion by the trier of fact. Wainwright v. Fontenot, 2000-0492 (La.10/17/00), 774 So.2d 70, 74. Before an appellate court can disturb the quantum of an award, the record must clearly reveal that the trier of fact abused its discretion. In order to make this determination, the reviewing court looks first to the individual circumstances of the injured plaintiff. Theriot v. Allstate Ins. Co., 625 So.2d 1337, 1340 (La.1993). Reasonable persons frequently disagree about the measure of general damages in a particular case. *1078 Youn, 623 So.2d at 1261. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should modify the award. Id.
In reviewing an attack on a general damage award, a court does not review a particular item in isolation; rather, the entire damage award is reviewed for an abuse |1Rof discretion, and if the total general damage award is not abusively high, it may not be disturbed. See Smith v. Goetzman, 97-0968 (La.App. 1st Cir.9/25/98), 720 So.2d 39, 48.
The record contains ample evidence to support the jury’s total award of $975,000.00 to Barry for his general damages as a result of his injuries, particularly to his back and ankle. After the accident, Barry was evacuated by helicopter to Ter-rebonne General Hospital. He was confined to the hospital for pain management and reduction of the swelling to his body. Having landed on his groin, Barry had issues with urination and testicular pain and underwent testing to resolve these injuries.
MRI findings showed that Barry had sustained two compression fractures to his spine at L-2 and L-4; and degenerative disc disease at L5-S1 had become symptomatic. Barry’s doctors related the back injuries to the accident. Because epidural steroid injections administered on multiple occasions provided diminishing relief, Barry has been required to use narcotic and anti-inflammatory medication to address his constant pain. The chronic back pain, not likely to resolve, is exacerbated by the ankle injury because the gait he uses to walk, developed to accommodate the permanent right foot injury, puts constant pressure on his lower back.
Insofar as the ankle injury, Dr. James Lalonde, an expert in orthopedic surgery (foot and ankle), determined that the accident had caused Barry to suffer a shattered ankle. Barry’s heel and the lateral side of his ankle on his right foot were broken in the accident. Initial surgery to fix the ankle proved unsuccessful when Barry subsequently developed infection. Barry underwent six additional surgeries in an attempt to minimize the pain he constantly endures and to maximize the function of the lower'right joint. Hardware to stabilize the ankle was surgically placed and then removed due to infection. Subsequent procedures were undertaken to utilize a bone graft, surgically removed from Barry’s knee, to allow maximum function of the foot |1fialong with permanent placement of screws. Despite extensive physical therapy, Barry continues to have problems. His right leg has been physically shortened. In sum, Barry’s lower leg function has been permanently altered.
As a result, Barry is medically restricted from standing or driving for prolonged periods. He cannot walk long distances and cannot negotiate uneven surfaces. Barry is unable to carry anything in his right hand because he has no cushion to absorb the weight in his right foot. Additionally, he is restricted from climbing or squatting due to problems with his balance.
Barry and his wife, Lori, testified about the incredible change in Barry’s lifestyle as a result of the injuries he sustained. Prior to the accident, Barry was an avid outdoorsman. He hunted, fished, and rode motorcycles since he was 14. After they married, Lori was his frequent companion during many outings. The two had taken many motorcycle trips over the years including to the Smokey Mountains, Hot Springs/Branson, Key West, Minnesota, *1079 Lake Superior, and Canada. They had even ridden the entire outline of the state of Florida on their motorcycles. Every weekend during hunting season, the Penni-sons were hunting. They had a hunting lease that kept them active between September and February. During the remaining months, the Pennisons fished. The jury was shown a photo of the couple saltwater fishing and another as they snorkeled. Photos of Barry parasailing, in a boat as he fished, and of the family on vacation were also shown to the jury. The jury was intimately familiar with the Pen-nisons’ active lifestyle. The jury also heard that since the accident, Barry has not been able to hunt, fish, or ride a motorcycle. When Barry tried to hunt one time after the accident, he slipped and fell. Lori explained that the injuries have taken away Barry’s sense of manhood. She described how Barry feels that he slows down others and is a burden. A family trip to Disney after the accident underscored his frustration. After walking around the park for a couple hours, with frequent breaks to rest, Barry went back to the hotel room and stayed there for the 117remainder of the vacation. When asked whether wheelchairs were available to assist him, Barry explained that his “manhood wouldn’t put [him] in that chair yet”; “[he] didn’t want to admit to being [crippled].”
The changes to his life have left Barry depressed. Although before the accident, he had been using a mild anti-depressant after the unexpected, unrelated deaths of three co-workers in a short period of time, Barry told the jury that since the motorcycle accident, his depression has become worse. Barry has been treated for depression, secondary to the chronic pain he has suffered in his back and foot. He has had suicidal thoughts, including a graphic incident when Lori was out of town that the Pennisons’ son described to the jury.
After the accident, Barry was confined to his bed for over a year. From October 1, 2010 through October 24, 2013, he had seen doctors 183 times, which included extensive physical therapy sessions, and had ingested over 4,000 pain pills. Still, he continues to be in pain, particularly in his ankle and back, with no permanent relief in sight and with absolutely no opportunity to return to the life he had before the accident. The jury heard Barry and Lori describe in detail the extensive pain Barry has suffered — physically and emotionally— and the impact the changes, brought about by the accident, have had on Barry’s life. The permanent changes to Barry’s body and, as a result of the injuries, to his lifestyle coupled with evidence of a life expectancy of 26 years (as testified to by expert economist Dr. Randolph Rice) clearly support the jury’s award of $975,000.00 to Barry for general damages. The jury carefully assessed the effects of the particular injuries to Barry and fashioned an award that cannot be said to have been an abuse of its much discretion. Thus, the trial court correctly incorporated the jury’s general damages awards into its final judgment.
[ 1sLoss of consortium damages:
The jury awarded Lori $150,000.00 for her loss of consortium damages. Defendants urge that this award is excessive.
In reviewing an award for loss of consortium, it is necessary to evaluate the elements that comprise a spouse’s loss of consortium claim. The compensable elements include loss of love and affection, loss of companionship, loss of material services, loss of support, impairment of sexual relations, loss of aid and assistance, and loss of felicity. Proof of any one of these components is sufficient for an award of consortium. A loss of consortium award is a fact-specific determination to be decided *1080 on a case-by-case basis and is disturbed only if there is a clear abuse of discretion. Lemoine v. Mike Munna, L.L.C., 2013-2187 (La.App. 1st Cir.6/6/14), 148 So.3d 205, 214.
The enormous changes in Barry’s life have impacted and changed Lori’s life. Lori described how life, especially immediately following the accident, was hard. It was no longer “their” life. Lori had no time to do anything other than care for Barry. Surgery after surgery, Lori cared for Barry around the clock for the first 13 months, while he was confined to the bed. She was unable to spend time with their grandchildren. Lori’s life, like Barry’s, was limited to the bedroom. She assisted him as he hobbled from the bed to the bathroom; and bathed him until his ankle had healed enough to allow him to take a shower with his leg sticking out. Lori acted as his nurse, caring for his wounds, changing his dressing, and providing support as Barry tried to regain his function. She was present for almost every doctor visit and usually drove him. Because Barry had to keep his leg elevated, Lori created a makeshift bed from egg crates and pillows in the back of her SUV; her backseats were permanently down to accommodate the contraption. Lori assisted Barry when he used a back brace, a “donut” to sit on, a potty, a walker, a seat riser for the toilet, a boot for. his leg, a shower chair, a wheelchair, and a scooter.
[19Because of the effect that the injuries have had on Barry’s lifestyle, Lori’s life was also “completely forever” changed. The couple who had hunted, fished, and ridden motorcycles together was no longer able to do that. She told the jury that since the accident, she had hunted just one time and had not fished or ridden motorcycles. Because of Barry’s injuries, the Pen-nisons had to forego their usual travel with their grandson’s baseball team as they had done before the accident.
Lori described to the jury the effect Barry’s injuries have had on their sex life, explaining that the couple had no sex at all for the first four months due to the groin injury and the back brace Barry had to use. The happy-go-lucky man to whom she had been married had become moody, in no small part because of the constant pain medication he had to take. He had also become depressed and frustrated. Lori stated that they no longer socialize as they did before the accident because of her husband’s condition. She explained that Barry feels like he is inconveniencing their friends and is keeping them from the activities they would do if he were not around. According to Lori, since the accident, she has had to constantly counsel Barry, trying to buoy his spirits, but she knows he is tired of hearing that things are going to get better.
Lori also explained to the jury how the business that the couple had operated together had to shut down when Barry could not perform the manual labor. Thus, the jury heard how Lori had lost the support of her partner in business as well.
In light of the evidence in this record, the jury’s award of $150,000.00 was not an abuse of discretion. Therefore, the trial court did not err by incorporating into its final judgment the award of $150,000.00 in loss of consortium damages to Lori.

Future Medical Expenses:

With regard, to future medical expenses, the jury awarded Barry $85,000.00. To recover such expenses, a plaintiff must establish that future medical expenses will, more probably than not, be medically necessary. A plaintiff shows this Improbability with supporting medical testimony and estimations of the probable cost of the expenses. Menard v. Lafayette *1081 Ins. Co., 2009-1869 (La.3/16/10), 31 So.3d 996, 1006.
Pointing to Dr. Lalonde’s testimony, defendants assert that $5,748.00, the amount of his fee related to an ankle fusion he stated Barry would probably need, was the only future medical expenses clearly established. And because Dr. Lalonde could not estimate with certainty the related hospital costs, but guesstimated somewhere between $15,000.00 and $20,000.00, defendants urge that on review the maximum amount the record supports is $20,748.00.
Although Dr. Lalonde did testify in conformity to defendants’ assertions, he also advised the jury that Barry would need surgery to his knee in addition to his ankle. Dr. Lalonde expressly stated that his fee did not include the costs of physical therapy and suggested that the amount of his guesstimate on hospital costs could be doubled or tripled. Dr. Lalonde also mentioned “medical inflation” to the jury.
Despite the limited testimony on the costs of future procedures, the jury’s award was not without any foundation. It had before it a breakdown of the actual costs Barry had incurred for prior operations. Among these was Barry’s last operation, which was approximately $30,000.00. Assuming surgeon’s fees of approximately $6,000.00, as testified to by Dr. Lalonde, two surgeries would amount to $12,000.00 plus an additional $60,000.00 in hospital costs, for a total of about $72,000.00 in future surgical costs. Dr. Lalonde’s testimony indicated that ongoing physical therapy was a real possibility after each operation. After his last operation, Barry incurred $2,673.00 in physical therapy expenses. The jury could have easily determined an additional $5,000.00 to $6,000.00 would be needed for Barry’s future physical therapy after the two operations.
The record also supports ongoing pain treatment for Barry’s back, in particular pain medication, as testified to by Dr. Michael Haydel, a physician with |⅞1 expertise in pain management. Admitted into evidence were medical expenses of $14,198.77 for prescriptions between October 1, 2010 and October 24, 2013. With a life expectancy of 26 years, the jury could readily conclude that Barry would incur at least $8,000.00 to $13,000.00 in future medical costs for future prescription costs.
From the evidence of the actual expenses Barry had incurred, the jury was free to infer .the amounts necessary for medical treatment that Dr. Lalonde and Dr. Haydel testified Barry would need. Thus, we cannot say the jury was erroneous in awarding $85,000.00 for Barry’s future medical expenses. The trial court’s final judgment correctly incorporated the jury’s award for this item of damages.

Loss of Income:

The record established that Barry ownéd and operated a house raising business. He had worked as a member of a crew beginning in 1982. After a few years, Barry talked his father into buying that business. Barry then worked with his brothers for several years but in the mid-1980s, he bought the business from his father and began raising houses as a sole proprietorship. In 1993, he and Lori converted the business into a limited liability corporation known as Barry’s House Leveling, LLC (BHL). The Pennisons’ tax returns show that as of 2007, BHL was wholly owned by Barry and Lori in partnership.
Defendants challenge the propriety of these awards for both past and future losses. . They assert that the jury erred as a matter of law in awarding the lost profits of the corporation to Barry individually.
*1082 The jury interrogatory requested that the jury award an amount for either loss of income or loss of profits. Although BHL, a tightly-held family business, is a separate legal entity from its members, see La. R.S. 12:1301 A(10) and (18); Lemoine, 148 So.3d at 212 (citing Charming Charlie, Inc. v. Perkins Rowe Associates, L.L.C., 2011-2254 (La.App. 1st Cir.7/10/12), 97 So.3d 595, 598), Barry is not pursuing a claim for any economic loss to BHL; nor can he pursue such acclaim in his individual name. See Lemoine, 148 So.3d at 212 (relying on Richard v. Morgan, 433 So.2d 263, 264 (La.App. 1st Cir.), writ denied, 438 So.2d 1108 (La.1983) (principal employee and shareholder of an incorporated business, who was injured in an accident, was not entitled to recover against the tortfeasor for the diminished value of the business due to the employee’s injuries) and Mahfouz v. Ogden, 380 So.2d 646, 649 (La.App. 1st Cir.1979) (plaintiff, who conducted business in corporate form and reaped the benefits of incorporation, cannot sue individually for damages incurred by the corporation)). Here, Barry sought, and was awarded, the actual wages that he lost as a result of the accident as evidenced by his personal tax returns.
To recover for actual wage loss, a plaintiff must prove that he would have been earning wages but for the accident in question. It is the plaintiffs burden to prove past lost earnings and the length of time missed from work due to the accident. The amount of lost earnings need not be proved with mathematical certainty, but by such proof as reasonably establishes the claim, and such proof may consist only of the plaintiffs own testimony. The fact finder is accorded broad discretion in assessing awards for lost earnings, but there must be a factual basis in the record for the award. An award for lost wages is subject to the manifest error standard of review because such damages must be proven with reasonable certainty. Lemoine, 148 So.3d at 212.
Awards for lost future income are intrinsically insusceptible of mathematical exactitude, and as such, the trier of fact must exhibit sound discretion in rendering awards that are consistent with the record and do not impose a hardship on either party. American Cent. Ins. Co. v. Terex Crane, 2003-0279 (La.App. 1st Cir.11/7/03), 861 So.2d 228, 234, writ denied, 2004-0327 (La.4/2/04), 869 So.2d 881. Factors to be considered in determining a proper award for loss of future income are the plaintiffs physical condition before and after the injury, the plaintiffs past work lajhistory and consistency thereof, the amount the plaintiff probably would have earned absent the injury complained of, and the probability that the plaintiff would have continued to earn wages over the remainder of his working life. Matos v. Clarendon Nat’l Ins. Co., 2000-2814 (La.App. 1st Cir.2/15/02), 808 So.2d 841, 850.
The medical evidence established that Barry was unable to return to work in any capacity from October 1, 2010 until April 2012. It was also undisputed that Barry was unable to return to his position in BHL as he had performed it before the accident due to physical limitations. The jury heard the expert testimony of vocational rehabilitation counsel- or, Carla Seyler, suggesting that Barry could have found an entry level, unskilled/limited skilled, sedentary position commencing in April 2012. But she was unable to tell the jury of a particular position available in Terrebonne Parish for Barry to commence. She also admitted on cross-examination that several positions she had indicated were within Barry’s medical restrictions really were not. On this point, the jury also heard the testimony of retired rehabilitation coun *1083 selor, Gordon Landry, who spent from April 2012 until October 2013, looking for a job for Barry in Terrebonne Parish within Dr. Lalonde’s medical restrictions. Despite having contacted 23 potential employers, Landry had not been able to find a specific employment opportunity for Barry.
Defendants urged to the jury, and again on appeal, that Barry should have been able to return to work at BHL in a purely supervisory position. Barry and Lori explained that BHL gave potential customers an estimate based on an inspection Barry undertook of each house. Barry examined every aspect of the house by crawling on his belly underneath pier-raised homes, looking at the foundation, seals, floor joints, and every other aspect of the house to determine if it was strong enough to be raised; or ascertaining what was needed to ensure the house was properly raised. Defendants offered the testimony of Herman Gregory Abry, accepted as an expert in house raising and leveling, to suggest that another person could have been |¡,4hired by BHL to crawl under the house with a camera while Barry sat in a truck and reviewed the photographs or video footage to determine the soundness of the house and the necessary material for a raising. The Pennisons testified they believed that the supervisory position as described by Abry was not a practical option for Barry. The Pennisons’ expert rehabilitation counselor, Thomas Meunier, Jr., also stated that he believed that Barry could not successfully function in that manner.
Defendants also suggested to the jury, and maintain again on appeal, that the house raising market that had been lucrative in the years immediately preceding Barry’s accident was not indicative of Barry’s income. The gist of defendants’ assertion, supported by Abry’s testimony, was that after Hurricanes Katrina and Rita, federal and state recovery moneys directed to the raising of Terrebonne Parish citizens’ homes were readily available and that Barry had been able to benefit from that. But as time lapsed, according to defendants, those revenues were no longer available and, therefore, Barry’s future income was more accurately reflected in his earnings for 2004 and the years preceding the hurricanes as well as in the non-storm related house raising work BHL had performed.
The Pennisons provided the testimony of Dr. Barry Kiem, an expert in climatology, who reviewed to the jury.the history of Terrebonne Parish water events, including hurricanes, storm surges, and rainfall. Dr. Kiem found that a five-inch or greater water event occurred every other year in the area. He opined that “absolutely” another hurricane would hit the parish in the future. Numerous parish officials testified to the continued availability of grant money for the elevation of homes in Terre-bonne Parish, indicating that over 1,500 homes had been identified by the parish as in need of elevation not only because of habitual flooding but also for purposes of obtaining affordable insurance in the future.
The jury heard defendants’ contention on the house raising “bubble” created by the 2005 hurricanes and rejected it. Supported by the evidence, the jury was free |2rjto conclude that the years immediately preceding the accident more accurately reflected Barry’s income than the time period before Hurricanes Katrina and Rita. In light of the medical evidence, the job market, and Barry’s inability to perform his position at BHL as he had before the accident, reasonable factual bases exist for the jury to have made awards to Barry for loss of income. See Stobart, 617 So.2d 880, 882-83.
*1084 Insofar as the jury’s award for past lost income in the amount of $600,000.00, the Pennisons introduced into evidence their amended tax returns showing an average annual gross income of $329,933.00 from January 1, 2006 through December 31, 2010. Based on that average, Dr. Rice calculated Barry’s lost income at $1,008,783.00. Defendants offered the testimony of Dr. Kenneth Boudreaux, an expert in economics. Dr. Boudreaux was asked to differentiate Barry’s earnings based on whether a contract BHL performed was storm-related or non-storm related. He excluded from Barry’s past income calculation all the contracts BHL had performed that were categorized as storm-related and determined Barry’s average annual income was $35,572.00. He also described to the jury different scenarios based on Seyler’s testimony of available jobs and on Barry returning to work in a supervisory position. Dr. Boudreaux stated that Barry’s past lost income ranged from no loss to $3,405.00 to $32,076.00.
The jury was free to reject Dr. Bou-dreaux’s testimony, particularly his assumption that Barry’s income was limited to only non-storm house raising. The jury was also free to discount Dr. Rice’s calculations, particularly in light of the conflicting evidence on whether Barry could have worked at all or returned to BHL in a supervisory position. As such, the jury’s award of $600,000.00, approximately two years of past income according to Dr. Rice’s calculations, for Barry’s lost income was not erroneous. Thus, the trial court correctly incorporated that award into its final judgment.
1 ^Insofar as the jury’s award of $2,200,000.00 for future loss of income to Barry, Dr. Rice testified that, based on U.S. Department of Labor statistics, Barry had a work life expectancy of 8.93 years and noted he would qualify for Social Security in 12.67 years. If Barry returned to work earning minimum wage in a sedentary job, he would earn $15,080.00 annually. Based on Dr. Rice’s calculations using the average annual income of $329,933.00, assuming he returned to a sedentary job, Barry would lose between $2,800,000.00 (for an 8.93 work life expectancy) and $4,100,000.00 (for the 12.67 years until he is eligible for Social Security benefits).
Dr. Boudreaux based his future lost wages on the assumption that once Barry returned to work, he could have earned $13.00/hour as testified to by Seyler. Thus, Dr. Boudreaux calculated the difference between $35,572.00 (the annual average income from non-storm related revenues) and approximately $27,000.00 (the approximate annual salary $13.00/hour yields) and concluded Barry lost approximately $8,000.00 per year. Dr. Boudreaux advised the jury that Barry would have to have $75,044.00 to put into a safe investment to make up the difference. Under the other scenarios Dr. Boudreaux suggested, Barry lost no money and was not entitled to any award for future lost income.
The jury’s award of $2,200,000.00 was not an abuse of discretion. The jury was within its province to reject the assumptions Dr. Boudreaux relied upon to make his calculations as to Barry’s future loss of wages. Similarly, the jury was free to discount the amount of future wages that Dr. Rice testified Barry would lose by implicitly determining that he could have returned to work at BHL in some sort of supervisory capacity; or that he could have otherwise returned to work. The jury may have also determined that as houses in Terrebonne Parish were raised, the market would diminish over time. Thus, it may have reasonably determined that Barry would have earned more money in the immediate years after the accident *1085 and less [ ?7as each year passed. The trial court correctly incorporated the jury’s award of $2,200,000.00 in its final judgment.
DECREE
For these reasons, the trial court’s final judgment, rendered in conformity to the jury’s verdict finding defendants 100 percent at fault and assessing general, loss of consortium, future medical, and past and future lost income damages totaling $4,200,000.00 in favor of Barry and Lori Pennison, is affirmed. Appeal costs are assessed against defendants-appellants, James Carrol “T.J.” Henry Jr., his employer, Frisco Construction Company (Frisco Construction), and their liability insurer, The Gray Insurance Company.
AFFIRMED.
WELCH, J., concurs without reasons.

. It is undisputed that Henry was in the course and scope of his employment with Frisco Construction at the time Barry sustained injuries.

. The legislature subsequently amended La. C.C.P. art. 966 to enact subparagraph E, which expressly permits that a summary judgment may be rendered dispositive of "a particular issue, theory of recovery, cause of action, or defense, in favor of one or more parties,” even though the granting of the summary judgment does not dispose of the entire case as to that party or parties. See La. 1997 Acts 483, § 1, effective July 1, 1997. Prior to Act 483, Article 966C provided, "A summary judgment may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages.”

. Defendants did not object when the jury was charged that, "In this case the defendants have been previously found at fault. However, this does not necessarily mean that they are 100 percent at fault.” They also failed to object to the portion of the verdict interrogatories, which indicated, "It has been previously determined that [Henry] was at fault with regard to the October 1, 2010 accident. However ... this does not mean he was 100% at fault.” Failure to timely object to a particular jury charge or interrogatory constitutes a waiver of that objection, and an appellant may not raise the issue for the first time on appeal. Travis v. Spitale's Bar, Inc., 2012-1366 (La.App. 1st Cir.8/14/13), 122 So.3d 1118, 1134, writs denied, 2013-2409 (La.1/10/14), 130 So.3d 327 and 2013-2447 (La.1/10/14), 130 So.3d 329. Thus, although defendants have the right to challenge the trial court’s interlocutory ruling as part of their unbridled appeal, their failure to object to the jury charges and verdict interrogatory underscores that they have never claimed Henry was free from fault.

. It appears that under an application of the plain language of La. C.C.P. art. 966 E, the trial court rendered a partial summary judgment that was dispositive on the particular issue of whether Henry was free from fault even though the granting of the summary judgment "did not dispose of the entire case as to that party or parties.” But this court has applied Article 966E to reverse a trial court's partial grant of summary judgment on "the issue of [a defendant’s] liability” where "any issue of comparative fault on the part of [plaintiff]” was reserved for the trier of fact, expressly holding that "issues of one parly's liability and comparative fault are so intertwined that a ruling on the first may, or at least appear to, unduly influence the second.” See Saba, 2007-0916 at pp. 2-3. Because we have found that any error in the untimely rendition of a partial summary judgment concluding that Henry bore some percentage of fault was not prejudicial, we find it unnecessary to examine the propriety of our holding in Saba and pretermit such a discussion.

. Cf. Williams, 637 So.2d at 1133 n. 2 in which, applying an earlier version of La. C.C.P. art. 966, the court found the trial court’s error in its untimely rendition of a partial summary judgment on the issue of liability was so material and the adverse impact on defendant's case was so prejudicial that it was impossible for the defendant to thereafter obtain a fair trial, and noted that plaintiff's serious credibility problems "carried over” to the quantum determination. Nothing in Barry's testimony about the manner of the accident was inconsistent. Indeed, Barry’s version of the facts as to Henry's failure to yield the right of way as he turned left was the same in its essential elements as that of the other eyewitnesses. The testimony to which defendants point was about business financial transactions that the Pennisons admitted to the jury had been untimely reported for tax purposes; and a signed form that indicated the Pennisons had never declared bankruptcy, although Barry told the jury that they had. This evidence addressed the Penni-sons' entitlement to damages. Any prejudice that would have resulted from the trial court's untimely rendition of partial summary judgment was directed to liability. The jury, who heard the Pennisons' version of the state of their business, implicitly found the Pennisons' explanation plausible, which was within its province to do. See Stobart v. State, Dep't of Transp. and Dev., 617 So.2d 880, 882-83 (La.1993). Thus, the damage awards were not interdicted. See Lam ex rel. Lam v. State Farm Mut. Auto. Ins. Co., 2005-1139 (La.11/29/06), 946 So.2d 133, 135-36 (when the error affects only one of several jury findings, each jury finding must be evaluated to determine the applicability of the manifest error rule to each). And the record is devoid of evidence that suggests any negative view from the trial court’s ostensibly untimely partial liability determination "carried over” into the quantum determination.

. In accordance with the verdict interrogatories, the jury determined Barry was entitled to $300,000.00 for past, present, and future physical pain and suffering; $200,000.00 for past present, and future mental pain and suffering; $175,000.00 for loss of enjoyment of life; and $300,000.00 for permanent disability-

. An award of $190,000.00 for past medical expenses made to Barry was not appealed.