# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 19-523


WILVON ALLISON, ET AL.

VERSUS

CITGO PETROLEUM CORPORATION AND
R & R CONSTRUCTION, INC.


\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2007-2925
HONORABLE SHARON D. WILSON, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## CANDYCE G. PERRET
## JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Phyllis M. Keaty, and Candyce G. Perret, Judges.


## JUDGMENT AMENDED AND AFFIRMED AS AMENDED.

**Robert E. Landry**
**Scofield, Gerard, Pohorelsky, Gallaugher & Landry**
**901 Lakeshore Drive, Suite 900**
**Lake Charles, LA   70601**
**(337) 433-9436**
**COUNSEL FOR DEFENDANT/APPELLANT:**
     **CITGO Petroleum Corporation**

**Craig Isenberg**
**Joshua O. Cox**
**Barrasso, Usdin, Kupperman, Freeman & Sarver, L.L.C.**
**909 Poydras Street, Suite 2400**
**New Orleans, LA   70112**
**(504) 589-9700**
**COUNSEL FOR DEFENDANT/APPELLANT:**
     **CITGO Petroleum Corporation**

**Marshall Joseph Simien, Jr.**
**Simien Law Firm**
**2129 Fitzenreiter Road**
**Lake Charles, LA   70601**
**(337) 497-0022**
**COUNSEL FOR DEFENDANT/APPELLANT:**
     **CITGO Petroleum Corporation**

**Wells T. Watson**
**Jake D. Buford**
**Bagget, McCall, Burgess, Watson & Gaughan**
**Post Office Drawer 7820**
**Lake Charles, LA   70606-7820**
**(337) 478-8888**
**COUNSEL FOR PLAINTIFFS/APPELLEES:**
     **Daniel Mayes**
     **Darrin Kenny**
     **Kevin D. Lewis**
     **Frank Garland Weathersby**
     **Jimmy Guillory**
     **Tommie David Schexnayder**
     **Terrell D. Thierry**
     **James Bellard**
     **Wilvon Allison**
     **James Raymond Joseph Rowe**
     **Wilbert Richard, Jr.**
     **Patrick O. Mouton**

**Richard E. Wilson**
**Somer G. Brown**
**Cox, Cox, Filo, Camel & Wilson**
**723 Broad Street**
**Lake Charles, LA   70601**
**(337) 436-6611**
**COUNSEL FOR PLAINTIFFS/APPELLEES:**
    **Daniel Mayes**
    **Darrin Kenny**
    **Kevin D. Lewis**
    **Frank Garland Weathersby**
    **Jimmy Guillory**
    **Tommie David Schexnayder**
    **Terrell D. Thierry**
    **James Bellard**
    **Wilvon Allison**
    **James Raymond Joseph Rowe**
    **Wilbert Richard, Jr.**
    **Patrick O. Mouton**

**PERRET, Judge.**

On appeal, CITGO Petroleum Corporation ("CITGO") challenges the trial court's personal injury awards to the following twelve plaintiffs: Wilvon Allison, James Bellard, James (Jimmy) Guillory, Darrin Kenny, Kevin Lewis, Daniel Mayes, Patrick Mouton, Wilbert Richard, Jr., James Rowe, Tommie Schexnayder, Terrell Thierry, and Frank Weathersby (collectively referred to as the "Plaintiffs"). For the following reasons, we amend the trial court judgment to reduce Mr. Mayes' medical expenses associated with his exposure from $614.00 to $200.00 and, in all other respects, we affirm the trial court judgment as amended.

**FACTS AND PROCEDURAL HISTORY:**

On June 19, 2006, CITGO had two tremendous releases from its facility, an air release and a slop oil release. In *Bradford v. CITGO Petroleum Corp.*, 17-296, pp. 2-3 (La.App. 3 Cir. 1/10/18), 237 So.3d 648, 657-58, *writ denied*, 18-272 (La. 5/11/18), 241 So.3d 314, (footnote omitted), this court summarized the operative facts as follows:

> On June 19, 2006, following a local flash flood, CITGO's Calcasieu Parish Refinery released four million gallons of slop oil and seventeen million gallons of wastewater into the Calcasieu River, contaminating over 100 miles of coastline with toxic liquids and mousse-like substances that emitted toxic fumes in addition to being toxic upon contact. The spill was the result of the failure and overflow of CITGO's closed-system, waste-water treatment unit. The overflow was described as a catastrophic event and an environmental disaster by CITGO's own representatives. The clean-up of the spill lasted for approximately six months, from June to December, 2006.
>
> CITGO's Material Safety Data Sheet (MSDS) on slop oil from March 2006 ranks it as a chronic health and fire hazard. The MSDS states that the oil is extremely flammable and poisonous, and it contains Hydrogen Sulfide ($H_2S$) gas which may be fatal if inhaled. It can enter the lungs and cause damage. It is harmful or fatal if swallowed. Slop oil contains above di minimus levels of benzene, a known cancer hazard which can cause leukemia and other blood disorders, $H_2S$, xylene, toluene, n-hexane, and ethylbenzene. Benzene, toluene, and xylene are volatile organic compounds (VOCs). VOCs are chemicals that evaporate from a solid or liquid form at room

temperature; long-term exposure can cause damage to the liver, kidneys, and central nervous system; short-term exposure can cause eye and respiratory tract irritation, headaches, dizziness, visual disorders, fatigue, loss of coordination, allergic skin reactions, nausea, and memory impairment. Pursuant to CITGO's MSDS, slop oil also contains hexane, heptane, octanes, nonane, and trimethylbenzenes. Slop oil and/or its components are listed on the Toxic Substances Control Act (TSCA) inventory.

Also on June 19, 2006, CITGO's steam lines became submerged and the facility released ($H_2S$) and sulfur dioxide (S02) from sixty stacks in illegal concentrations for a full day, approximately twelve hours. The wind was blowing from the southeast toward the north and northwest, then calming for parts of the day, allowing the toxic emissions to release into the surrounding community.

CITGO's Material Safety Data Sheet ("MSDS") for slop oil, dated March 29, 2006, indicates that slop oil is amber to dark amber in color and has an odor similar to rotten eggs. Additionally, the MSDS states that slop oil is "Extremely Flammable and Poisonous" and that it "Contains Benzene – Cancer Hazard. Can cause leukemia and other blood disorders." The MSDS explains that if inhaled, "the gas or vapor may cause severe nose, throat, respiratory tract, and lung irritation . . . . Symptoms are characterized by coughing, choking, or shortness of breath. Breathing this material may cause central nervous system depression with symptoms including nausea, headache, dizziness, fatigue, drowsiness, or unconsciousness." If it comes into contact with the eyes, "[t]his material can cause eye irritation with tearing, redness, or a stinging or burning feeling." The MSDS also explains that slop oil can cause skin irritation, "with redness, an itching or burning feeling, and swelling of the skin."

The MSDS explains that CITGO's slop oil is typically composed of eleven chemicals and describes the different signs and symptoms of acute exposure through inhalation, eye contact, skin contact, and ingestion, as well as the chronic

2

health effects, conditions that may be aggravated by exposure, target organs, and the carcinogenic potential.

In an April 28, 2016 deposition, Mr. Frank Parker, the Plaintiffs' industrial hygienist expert, testified to the toxicity of the chemicals spilled, how they are released, and the symptoms and health effects that occur in people who are exposed to those chemicals. Mr. Parker explained that slop oil is a complex mixture of chemicals without an exposure standard and that by the time you smell benzene, you have been overexposed. Specifically, he stated:

Q. And if you smell benzene, you're overexposed; right?

A. Yes, no question about that.

Mr. Parker noted that workers within the plant generally withstand more exposure than people in the community and that some people are more susceptible to certain chemicals than others.

The Plaintiffs filed suit against CITGO on May 25, 2007. CITGO stipulated to fault and contested the issue of damages. The Plaintiffs at issue in this appeal worked at the CITGO Refinery on the day of the releases and during the clean-up following the slop oil spill. They assert injuries as a result of their exposure to the toxic chemicals in the slop oil and the air releases.

A bench trial was held on October 29, 2018. At trial, the Plaintiffs testified to their injuries and their medical records were admitted into evidence. Dr. Steve Springer ("Dr. Springer") also testified on behalf of the Plaintiffs and found that, in his medical opinion, the Plaintiffs' symptoms resulted from their exposure to the releases in June 2006.

On January 4, 2019 and February 26, 2019, the trial court ruled in favor of the Plaintiffs on causation and damages. In a judgment signed on March 6, 2019,

3

the trial court awarded expert fees and judicial interest from the date of judicial

demand. It also awarded damages to the Plaintiffs as follows:

- **Wilvon Allison** was awarded $30,961.88, which accounts for pain and suffering ($24,000.00), mental anguish ($3,500.00), loss of enjoyment of life ($3,000.00), and medical expenses ($461.88).

- **James Bellard** (deceased) was awarded $30,200.00, which accounts for pain and suffering ($30,000.00), and medical expenses ($200.00).

- **James (Jimmy) Guillory** was awarded $32,500.00, which accounts for pain and suffering ($20,000.00), mental anguish and fear of future illness ($7,500.00), and loss of enjoyment of life ($5,000.00).

- **Darrin Kenny** was awarded $45,150.00, which accounts for pain and suffering ($30,000.00), fear of future illness ($10,000.00), loss of enjoyment of life ($5,000.00), and medical expenses ($150.00).

- **Kevin Lewis** was awarded $45,150.00, which accounts for pain and suffering ($35,000.00), loss of enjoyment of life ($10,000.00), and medical expenses ($150.00).

- **Daniel Mayes** was awarded $50,614.00, which accounts for pain and suffering ($40,000.00), mental anguish ($5,000.00), loss of enjoyment of life ($5,000.00), and medical expenses ($614.00).

- **Patrick Mouton** was awarded $56,086.00, which accounts for pain and suffering ($40,000.00), fear of future illness ($10,000.00), loss of enjoyment of life ($5,000.00), and medical expenses ($1,086.00).

- **Wilbert Richard, Jr.** was awarded $35,150.00, which accounts for pain and suffering ($20,000.00), fear of future illness ($10,000.00), loss of enjoyment of life ($5,000.00), and medical expenses ($150.00).

- **James Rowe** was awarded $35,150.00, which accounts for pain and suffering ($20,000.00), fear of future illness ($10,000.00), loss of enjoyment of life ($5,000.00), and medical expenses ($150.00).

- **Tommie Schexnayder** was awarded $40,350.00, which accounts for pain and suffering ($25,000.00), fear of future illness ($10,000.00), loss of enjoyment of life ($5,000.00), and medical expenses ($350.00).

- **Terrell Thierry** was awarded $50,212.00, which accounts for pain and suffering ($35,000.00), fear of future illness ($10,00.00), loss of enjoyment of life ($5,000.00), and medical expenses ($212.00).

- **Frank Weathersby** was awarded $60,350.00, which accounts for pain and suffering ($45,000.00), fear of future illness ($10,00.00), loss of enjoyment of life ($5,000.00), and medical expenses ($350.00).

CITGO filed a motion for suspensive appeal, which the trial court granted.

CITGO now appeals alleging the following two assignments of error:

1.      The district court abused its discretion by copying verbatim the Plaintiffs' Pre-Trial Memorandum as its ruling specific to each plaintiff and awarding grossly excessive general damages, which were unsupported by the evidence and beyond that which a reasonable trier of fact could assess for the minor health effects alleged and admitted by plaintiffs.

2.      The district court abused its discretion in awarding damages for loss of enjoyment of life and mental anguish to plaintiffs who provided no testimony that supported such claims.

Because both assignments of error deal with the amounts awarded for general damages, we will address them together.

**STANDARD OF REVIEW:**

On appeal, this court may not set aside a trial court's factual findings absent manifest error or unless the trial court was clearly wrong. *Stobart v. State, Through DOTD*, 617 So.2d 880 (La.1993); *Rosell v. ESCO*, 549 So.2d 840 (La.1989). To reverse a trial court's factual findings, the appellate court must apply a two-tiered test when reviewing the facts and must find that (1) the record does not establish a reasonable factual basis for the finding of the trial court, and (2) "the record establishes that the finding of the trial court is clearly wrong (manifestly erroneous)." *Bradford,* 237 So.3d at 658-59. However, "[i]f the trial court's findings are reasonable in light of the record reviewed in its entirety, the appellate court may not reverse." *Arabie v. CITGO Petroleum Corp.*, 10-2605, p. 4 (La. 3/13/12), 89 So.3d 307, 312. Thus, "when there are two permissible views

5

of the evidence, the factfinder's choice between them cannot be manifestly erroneous." *Id*.

**DISCUSSION:**

On appeal, CITGO argues that the trial court abused its discretion by copying, as its ruling, the Plaintiffs' pretrial memorandum and as such, the trial court ignored undisputed evidence elicited at trial. It argues that the Plaintiffs' damage awards were grossly excessive and unsupported by the evidence and beyond that which a reasonable trier of fact could assess for the minor health effects alleged and admitted by the Plaintiffs. Additionally, CITGO argues that the trial court abused its discretion in awarding damages for loss of enjoyment of life and/or mental anguish and that those awards should be reversed.

In response, the Plaintiffs allege that it was completely within the discretion of the trial court to find that the facts asserted in its pretrial memorandum were proven after the court heard the testimony of the Plaintiffs, the testimony and reports of Dr. Springer, and upon reviewing the entirety of the evidence presented. The Plaintiffs argue that the record is filled with supportive scientific evidence and expert testimony on the health effects of being exposed to the toxic chemicals that were released from the CITGO Refinery in June 2006 and that the trial court was within its discretion in awarding the damages based on the totality of the evidence.

We first note that the reasons for judgment are not the judgment itself. Appeals are taken from the judgment, not the written reasons for judgment. La.Code Civ.P. art. 1918. Accordingly, we will thoroughly review the record to address CITGO's argument that the trial court abused its discretion in its excessive damage awards to the Plaintiffs.

As stated by this court in *Thibeaux v. Trotter*, 04-482, p. 3 (La.App. 3 Cir. 9/29/04), 883 So.2d 1128, 1130, *writ denied*, 04-2692 (La. 2/18/05), 896 So.2d 31:

6

The types of damages awarded in a personal injury action consist of general and special damages. General damages, are speculative in nature and, thus, incapable of being fixed with any mathematical certainty. They include pain and suffering, physical impairment and disability, and loss of enjoyment of life. *Wainwright v. Fontenot,*00-0492 (La.10/17/00), 774 So.2d 70. Special damages, however, may be determined with some degree of certainty and include past and future lost wages and past and future medical expenses. *Id.*

General damages are reviewed for an abuse of discretion because the trial court "is in the best position to evaluate witness credibility and see the evidence firsthand." *Bouquet v. Wal-Mart Stores, Inc.*, 08-309, p. 4 (La. 4/4/08), 979 So.2d 456, 459. "The role of an appellate court in reviewing a general damages award is not to decide what it considers to be an appropriate award but rather to review the exercise of discretion by the trier of fact." *Cormier v. Citgo Petroleum Corp.*, 17-104, p. 4 (La.App. 3 Cir. 10/4/17) 228 So.3d 770, 776, *writ denied*, 17-2138 (La. 2/9/18), 237 So.3d 491. The trier of fact has great, even vast discretion in awarding general damages. *Youn v. Maritime Overseas Corp.*, 623 So.2d 1257 (La.1993), *cert denied*, 510 U.S. 1114, 114 S.Ct. 1059 (1994).

"Mental anguish and grief refers to the 'pain, discomfort, inconvenience, anguish, and emotional trauma' that accompany the injury. *McGee* [*v. A C And S, Inc.*, 05-1036, (La. 7/10/06), 933 So.2d 770,] 775." *Rachal v. Brouillette*, 12-794, p. 5 (La.App. 3 Cir. 3/13/13), 111 So.3d 1137, 1142, *writ denied*, 13-690 (La. 5/3/13), 113 So.3d 217. Further, "[l]oss of enjoyment of life . . . refers to the detrimental alterations of the person's life or lifestyle or the person's inability to participate in the activities or pleasures of life that were formerly enjoyed prior to the injury." *McGee*, 933 So.2d at 775. "[W]hether or not loss of enjoyment of life is recoverable depends on the particular facts of the case, and should be left to the district court's discretion on a case-by-case analysis." *Id.* at 779. Additionally, in reviewing a general damage award, "a court does not review a particular item in

isolation; rather, the entire damage award is reviewed for an abuse of discretion, and if the total general damage award is not abusively high, it may not be disturbed." *Pennison v. Carrol*, 14-1098, pp. 14-15 (La.App. 1 Cir. 4/24/15), 167 So.3d 1065, 1078, *writ denied*, 15-1214 (La. 9/25/15), 178 So.3d 568.

Wilvon Allison:

Mr. Allison testified that he was working for K-Jon, a business that services CITGO's portable restrooms, at the time of the releases. Mr. Allison testified that his job caused him to spend two hours, every day, at CITGO both before and after the releases. On the day of the releases, Mr. Allison testified that he noticed a strong smell and that it lasted about a week. Following his exposure to the releases, Mr. Allison testified that he visited Dr. Carolyn Hutchinson on July 12, 2006, with complaints of headaches, dizziness, and itching.

Mr. Allison was also seen by Dr. Springer on August 11, 2006, with complaints of shortness of breath and sinus issues that he related to his exposure to the CITGO releases. Dr. Springer found that "Mr. Allison's symptoms[,] which included at least two months of documented complaints of headaches, dizziness, shortness of breath, eye irritation, and itching[,] were caused by his exposure to the air release from Citgo on or around June 19, 2006." Dr. Springer prescribed medications to help with the sinus irritation and Mr. Allison testified that he refilled the prescriptions three times.

Based upon the testimony and medical evidence in the record on review, we find the trial court was well within its discretion in awarding Mr. Allison $24,000.00 for pain and suffering, $3,500.00 for mental anguish, $3,000.00 for loss of enjoyment of life, and $461.88 in medical expenses. Accordingly, we find no merit to CITGO's argument that Mr. Allison's general damage award was grossly excessive.

8

James Bellard:

Mr. Bellard's March 5, 2009 deposition was entered into evidence at trial since he died in September 2013. Mr. Bellard testified that he worked "as a laborer and a forklift driver and a concrete finisher for R&R [Construction]" and that "[a]ll of [his] work was out at the [CITGO] Refinery." Mr. Bellard testified that he was at the CITGO Refinery at the time of the releases and that after the releases, he helped to clean up the oil mess for two months. Mr. Bellard testified that he worked on the clean-up project five days a week, ten hours a day, and that the oil had a "very strong smell[,]" "[l]ike a chemical, like that would burn your face." Although Mr. Bellard testified that he wore gloves and boots during the two-month cleanup, he was not provided with, and did not wear, a respirator. Mr. Bellard testified that as a result of his exposure to the spill, he suffered from a burning nose and burning eyes throughout the two months he worked on the clean-up project and that after the clean-up ended, he experienced symptoms of shortness of breath and tiredness.

Dr. Springer testified that he treated Mr. Bellard in March 2007, for dizziness and shortness of breath. Dr. Springer found that "Mr. Bellard's symptoms, including his nose and eye irritation, difficulty sleeping, dizziness, fatigue, and shortness of breath were all caused by his exposure to slop oil from [CITGO] on and around June 19, 2006."

Based upon the testimony and medical evidence in the record on review, we find that the trial court was well within its discretion in its award of $30,000.00 for Mr. Bellard's pain and suffering and its award of $200.00 for medical expenses. Accordingly, we find no merit to CITGO's argument that Mr. Bellard's general damage award was grossly excessive.

James (Jimmy) Guillory:

Mr. Guillory testified that he was working as a boilermaker for Turner Industries at the CITGO Refinery on the day of the releases but that after the releases, he was told to work on the clean-up detail. Mr. Guillory testified that he worked on the clean-up for four days and that he was only provided with boots and a slicker suit during that time. He testified that he was not provided with any type of breathing apparatus while cleaning up the oil, and that he suffered from "an irritated throat, . . . burning eyes, . . . runny nose, and the smell; the smell was awful too." Mr. Guillory testified that his symptoms lasted for "months" and that he "just felt funny." Mr. Guillory testified that he was exposed to Benzene during that time period, and thus he fears contracting a future illness. Mr. Guillory testified to his fear of Benzene as follows:

> Well, years ago when I was living in Austin there was a man that used to work around a lot of that and that's what - - that's what killed him. The Benzene that was in the gasoline and oil that he worked in. So . . . I'm scared of it. When I pump gas in my car[,] I turn my head.

Dr. Springer found, based on Mr. Guillory's testimony and his own experience with treating others arising out of this particular exposure event, that Mr. Guillory's symptoms, "which included nose and eye irritation, stomach upset, loss of appetite, and lingering headaches[,] were caused by his exposure, both the air release and slop oil from [CITGO] around that June 19th timeframe."

Based upon the testimony and medical evidence in the record on review, we find that the trial court was within its discretion in awarding Mr. Guillory $20,000.00 for pain and suffering, $7,500.00 for mental anguish and fear of future illness associated with the exposure, and $5,000.00 for loss of enjoyment of life associated with his exposure. Accordingly, we find no merit to CITGO's argument that Mr. Guillory's general damage award was grossly excessive.

10

Darrin Kenny[1]:

In his August 28, 2018 deposition, Mr. Kenny testified that he was employed by Phillips Service Corporation ("PSC") as a service technician and that he did most of his work at the CITGO Refinery. On the morning of the releases, Mr. Kenny testified that he "got to work around 6:15 [a.m.]" and that "[t]here was a strong hazy look all over the plant and a very strong odor and everyone was coughing and wheezing." At that time, "everybody's H2S monitors went off" and he was "evacuated out [of] the plant" and "set up [] maybe a mile to two miles away from the plant." Mr. Kenny testified that "[p]rior to it [the H2S monitor] going off . . . I was already in the process of coughing, and my eyes were beginning to get irritated because of the hazy odor and look all around the plant[.]" Mr. Kenny was moved off site for two hours before he "immediately went to the wastewater treatment plant and began the process of cleaning up the slop oil." Mr. Kenny testified that he worked on the clean-up for approximately six to eight weeks and that the cleaning crew "didn't receive respirators until approximately two weeks after the initial spill[.]" Mr. Kenny testified that, after the releases, he suffered from nausea, vomiting, burning eyes, skin irritation, shortness of breath, coughing, fatigue, sore throat, excessive thirst, excessive urination, and headaches. Although Mr. Kenny visited Moss Regional on July 25, 2006, with reports of chemical exposure, the facility did not have the ability to test for chemical exposure and he was unable to be treated. On August 19, 2006, Mr. Kenny saw Dr. Springer, who prescribed medications to help him with his symptoms.

Mr. Kenny also testified that he was concerned about his health after being exposed to Benzene. Specifically, Mr. Kenny testified as follows:

---

[1] In lieu of testimony at trial, Mr. Kenny's deposition was entered into evidence because he is presently serving a prison sentence at Allen Correctional Center in Kinder, Louisiana.

Q. Okay. And then what then do you know about [B]enzene?

A. Well, I know it's a hazardous. It's hazardous material. That's basically it.

Q. Okay. All right. And then that in fact your exposer to [B]enzene, does that give you any hyper concerns for the future?

A. Most definitely.

Q. And why is that?

A. Because I watch constantly on TV, on the news and everything all these old, old chemical plant cases that's arising back now from years ago. And it makes me think of my own.

Q. Okay. I got you. It makes you think about your own exposure?

A. Yes.

Dr. Springer testified that he treated Mr. Kenny on August 19, 2006. Dr. Springer found that "Mr. Kenny's symptoms which included at least two months of nausea - - complaints of nausea, vomiting, burning eyes, skin irritation, shortness of breath, coughing, fatigue, sore throat, and headaches were caused by his exposure to slop oil from [CITGO] on and around June 19, 2006."

Based upon the testimony and medical evidence in the record on review, we find that the trial court was within its discretion in awarding Mr. Kenny $30,000.00 for pain and suffering, $10,000.00 for fear of future illness associated with exposure, $5,000.00 for loss of enjoyment of life associated with his exposure, and $150.00 for medical expenses. Accordingly, we find no merit to CITGO's argument that Mr. Kenny's general damage award was grossly excessive.

Kevin Lewis:

Mr. Lewis testified at trial that he was working for R&R Construction at the CITGO Refinery on the "digging crew" at the time of the releases but that after the releases, he was told to work on the clean-up detail. Mr. Lewis testified that while on the clean-up detail, he tried to contain the oil from getting into the water system.

12

During the clean-up, Mr. Lewis testified that he was provided with boots and a "little cover uniform" but that he was not given a respirator until a couple of days after the releases. Mr. Lewis testified that he worked on the clean-up for three weeks, seven days a week with twelve-hour shifts. Following the clean-up, Mr. Lewis visited Dr. Springer on August 25, 2006, with complaints of headaches, shortness of breath, sinus symptoms, and fatigue as a result of his exposure to the slop oil.

Dr. Springer testified that he treated Mr. Lewis following the releases and that Mr. Lewis complained of having "some sleep disturbance and feeling run down since the exposure[,]" that "[h]is eyes burned for the first 14 days or so of cleaning up[,]" and that "he had some chest discomfort, difficulty breathing, and shortness of breath." Dr. Springer found that "Mr. Lewis' symptoms[,] which included at least two months of complaints of headaches, shortness of breath and fatigue as well as initial complaints of eye irritation were caused by his exposure to slop oil from CITGO on and around June 19, 2006."

Based upon the testimony and medical evidence in the record on review, we find that the trial court was within its discretion in awarding Mr. Lewis $35,000.00 for pain and suffering, $10,000.00 for loss of enjoyment of life associated with his exposure, and $150.00 for medical expenses. Accordingly, we find no merit to CITGO's argument that Mr. Lewis's general damage award was grossly excessive.

Daniel Mayes:

Mr. Mayes testified at trial that, prior to the releases, he was working for R&R Construction at the CITGO Refinery as a carpenter. On June 20, 2006, Mr. Mayes began working on the clean-up, which entailed having him ride in a boat to "sop up the oil" along the banks of the river and the marsh areas for a couple of months. Mr. Mayes testified that he initially worked a fourteen-hour day, seven

13

days a week, but that the hours decreased to ten hours a day toward the end of the clean-up. Mr. Mayes testified that he suffered from nausea, shortness of breath, and occasional vomiting while working on the clean-up crew and that he "developed a lot of swelling of [his] lip, throat, and jaw area" upon returning to his work at the refinery. Mr. Mayes treated with Dr. Thomas Lebeau for his swelling, and after taking a prescribed antibiotic and taking a week off of work, the swelling subsided. However, no doctor opined that the lip, throat, or jaw swelling was caused by or connected to any claimed exposure.

Dr. Springer testified that he treated Mr. Mayes on March 6, 2007, for "dizziness, headaches, shortness of breath, and sore throat, [and] that these had all occurred on that 7/25/[06] date." Dr. Springer found that "Mr. Mayes' symptoms contemporaneous with and during the time that he was working on the cleanup, including his gastrointestinal issues, shortness of breath, sore throat, dizziness, and headaches were all caused by his exposure to slop oil[.]" However, Dr. Springer specifically testified that he did not "have any sort of opinion that [Mr. Mayes'] mouth swelling or his jaw swelling was in any way related to his exposure." In regard to Dr. Lebeau's treatment of Mr. Mayes, Dr. Springer testified as follows:

> Q.    And so with - - you're also not suggesting or giving an opinion that any of this treatment with Dr. Lebeau was related to any of the symptoms or complaints that you have opined about, true?
>
> A.    That's true if we're talking about jaw swelling and - -
>
> Q.    Right.
>
> A.    -- the other stuff, that's - - he had an abscessed tooth or something.

Based upon the testimony and medical evidence in the record on review, we find merit to CITGO's argument that the trial court erred in including Dr. Lebeau's medical expenses of $479.94 for Mr. Mayes' unrelated infection and jaw swelling

14

treatment. The only other medical expense in the record is Dr. Springer's March 8, 2007 invoice of $200.00 for Mr. Mayes' Pulmonary Function Test. As such, we amend Mr. Mayes' medical expenses from $614.00 to $200.00. In all other respects, we find the trial court was within its discretion in awarding general damages of $40,000.00 for Mr. Mayes' pain and suffering, $5,000.00 for his mental anguish associated with exposure, and $5,000.00 for loss of enjoyment of life.

Patrick Mouton:

Mr. Mouton testified at trial that, prior to the releases, he was working for R&R Construction at the CITGO Refinery as a general laborer. Mr. Mouton testified that on the day of the releases, "everybody was assigned to the clean up crew" and that he "was there from day one from the time it was happening for seven weeks, seven days a week, twelve hours a day." When asked to explain what it was like when exposed to the slop oil, Mr. Mouton testified: "Well, my eyes initially [were] the first thing I noticed started burning. And then I started having respiratory problems. I was coughing and it gave me a severe headache." Following his exposure to the oil, Mr. Mouton also complained of having issues with nausea and itching due to the slop oil coming into contact with his skin. Dr. Springer treated Mr. Mouton for these symptoms on July 25, 2006, March 8, 2007, May 4, 2007, and June 15, 2007.

Mr. Mouton also testified to his fear of a future illness. Specifically, Mr. Mouton testified, as follows:

> A. Well, I was exposed to Benzene that causes cancer and I've got to live the rest of my life waiting and worry[ing] about if I'm gonna catch cancer on[e] day because it's related to the exposure. And I've actually had somewhat of a scare already on it. But as of right now, yeah, I've got to live the rest of my life worrying about if I'm gonna ever catch cancer."

15

Q.      Whenever you said you had a scare already, what do you mean?

A.      Well, this happened in 2006.  In 2011[,] I was approximately 32 years old in great health.  I went to the doctor one day and come to find out I had a tumor on my hip.  My bone had been deteriorating and, of course, I took all the test.  With the good Lord, thank the Lord, everything came back, you know, negative.  But, I mean, that's just the one time I already had a scare thinking about this exposure causing me to have by bone deteriorating and have cancer.  So I'm just - - got to live with that the rest of my life.

Dr. Springer testified at trial that "Mr. Mouton's burning eyes, respiratory difficulty, headaches, nausea, and skin irritation were all caused by his exposure to the slop oil[,]" but that the symptoms, for the most part, were limited to the duration of his clean-up work.  Mr. Mouton testified at trial that he worked seven weeks on the clean-up crew.

Based upon the testimony and medical evidence in the record on review, we find that the trial court was within its discretion in awarding Mr. Mouton $40,000.00 for pain and suffering, $10,000.00 for fear of future illness associated with his exposure, $5,000.00 for his loss of enjoyment of life, and $1,086.00 for Dr. Springer's medical expenses.  Accordingly, we find no merit to CITGO's argument that Mr. Mouton's general damage award was grossly excessive.

Wilbert Richard, Jr.:

Mr. Richard testified at trial that, prior to the releases, he was working for R&R Construction at the CITGO Refinery in maintenance.  After the releases, Mr. Richard testified that he worked on the clean-up for about a month "or longer."  On August 16, 2006, Mr. Richard visited Dr. Springer with complaints of shortness of breath, coughs, headaches, and a rash with itching.

Mr. Richard also testified to having a fear of a future illness.  Specifically, Mr. Richard testified:

I mean, they spoke of us [having a] higher potential of having cancer or the chemicals that we worked in, they don't know what

16

symptoms, what it caused but it did mention cancer. And I'm just concerned - - I want my life because I have kids, young kids, . . . I don't want to be sick and - - where I can't enjoy my life because of my health, you know, just having symptoms, you know, cancer or other things like that[.]

When asked at trial if he had gone back, in the last twelve years, to ask a doctor whether he should be concerned about the chemical exposure, Mr. Richard testified as follows:

No, I haven't because, you know, like I haven't because I haven't been feeling too bad and also I'm kind of scared to even come and find out. . . . I don't want to know . . . it's like some things you just want to leave it alone until ever it starts to show the signs and stuff, you know.

Dr. Springer also testified at trial and found that Mr. Richard's "symptoms, including rash, itching, lightheadedness, headaches, cough, and shortness of breath were all caused by his exposure to slop oil from [CITGO]." However, Dr. Springer's opinion of Mr. Richard's exposure did not go beyond his office visit of August 16, 2006.

Based upon the testimony and medical evidence in the record on review, we find that the trial court was within its discretion in awarding Mr. Richard $20,000.00 for pain and suffering, $10,000.00 for fear of future illness associated with exposure, $5,000.00 for loss of enjoyment of life, and $150.00 for medical expenses. Accordingly, we find no merit to CITGO's argument that Mr. Richard's general damage award was grossly excessive.

James Rowe:

Mr. Rowe testified at trial that, prior to the releases, he was working for Thermo Insulation at the CITGO Refinery abating asbestos. After the releases, he testified that "they got everybody from Thermo Insulation . . . to help with the oil spill at the clean[-]up. They gave us some Tyvek suits and some duct tape and some gloves to duct tape the gloves around [our] wrist[s]." Mr. Rowe testified that

he worked twelve hours a day on the clean-up for about a week.  Mr. Rowe visited Dr. Springer on July 29, 2006, with complaints of breathing difficulty, headaches, and a rash.  Mr. Rowe testified that his breathing issues lasted "about one to two weeks," and that his headaches and rash lasted "around two to three weeks[.]"  Mr. Rowe also testified regarding his fear of future illness because of the fact that Benzene was in the oil.  Mr. Rowe testified that he fears "coming down with cancer or getting cancer in the future" because of his exposure to Benzene.

Dr. Springer also testified at trial and found that "Mr. Rowe's burning eyes, skin irritation, breathing difficulty, and headaches were caused by his exposure to slop oil from [CITGO]."  Dr. Springer testified that all of Mr. Rowe's symptoms had resolved by the time he treated him on July 29, 2006.

Based upon the testimony and medical evidence in the record on review, we find that the trial court was within its discretion in awarding Mr. Rowe $20,000.00 for pain and suffering, $10,000.00 for fear of future illness associated with exposure, $5,000.00 for loss of enjoyment of life, and $150.00 for medical expenses.  Accordingly, we find no merit to CITGO's argument that Mr. Rowe's general damage award was grossly excessive.

Tommie Schexnayder:

Mr. Schexnayder testified at trial that, prior to the releases, he was working for a security company, Day and Zimmerman, at the CITGO Refinery.  Mr. Schexnayder testified that on the day of the releases, "it stunk" and that he "started feeling light-headed and nauseous."  Following the releases, Mr. Schexnayder testified that he worked twelve hours a day securing the CITGO facility and that as a result, he suffered from "[b]ad sinus, [nausea], headaches, [and] migraines" for "about a month, a month-and-a-half" following the releases.

18

The record reflects that Mr. Schexnayder visited Dr. Van Snider on July 12, 2006, complaining of sinus congestion, breathing problems, and chest pain. Dr. Snider treated Mr. Schexnayder's respiratory symptoms/sinus symptoms at that time with antibiotics and an antihistamine/nasal decongestant. Thereafter, on July 25, 2006, Dr. Springer diagnosed Mr. Schexnayder with rhinitis and sinusitis. Dr. Springer found that "Mr. Schexnayder's symptoms[,] which included two weeks of nausea as well as headaches and sinus complaints, respiratory difficulty, and cough were all caused by his exposure to slop from Citgo." On cross-examination, Dr. Springer testified that Mr. Schexnayder's symptoms from the releases lasted "at least to the timeframe of [his] visit [on] 7/25 of '06."

Mr. Schexnayder testified at trial that he continues to have ongoing sinus symptoms and migraines as a result of being exposed to the slop oil. When asked to explain his fears or concerns regarding the future, Mr. Schexnayder testified as follows:

> I do have fears of the future. And the reason I say that [is] because my wife died of cancer, my mother-in-law died of cancer[,] [and] several friends died from cancer. They had no petrochemical relationships but they died. And it's just - - for me, you tell me that the release of so many parts per billion is allowable. But after a long period of time cumulative [e]ffects will get to you. And people say, well, no, it [w]on't happen. But through science it's been proven, especially the way it is now. People dying left and right behind cancer. Yes, it's a big concern of mine.

Based upon the testimony and medical evidence in the record on review, we find that the trial court was within its discretion in awarding Mr. Schexnayder $25,000.00 for pain and suffering, $10,000.00 for fear of future illness associated with his exposure, $5,000.00 for loss of enjoyment of life, and $350.00 for his medical expenses. Accordingly, we find no merit to CITGO's argument that Mr. Schexnayder's general damage award was grossly excessive.

19

<u>Terrell Thierry</u>:

Mr. Thierry testified at trial that, prior to the releases, he was working for a security company, Day and Zimmerman, at the CITGO Refinery. After the releases, Mr. Thierry testified that his job duties changed in that he had "to spend a lot of time on the docks to make sure nobody - - the only people that were back there were authorized personnel." Mr. Thierry testified that he visited Dr. Springer on August 1, 2006, with complaints of "sore throat, diarrhea, shortness of breath, and nausea." He also testified that he suffered with headaches. Mr. Thierry testified that his symptoms lasted between two to three months.

Additionally, Mr. Thierry testified regarding his fear of having a future illness. Specifically, Mr. Thierry testified that he worries about the future "because I know Benzene for a long[-]term exposure like we had without [any] respiratory protection, Benzene can cause cancer. And that's one of my biggest fears is later on down the line[,] was I exposed long enough to where it could do something to me down the line[.]"

Dr. Springer testified at trial that he treated Mr. Thierry following the exposure to the slop oil and found that "Mr. Thierry's symptoms, including headaches, nausea, vomiting, diarrhea, nasal irritation, shortness of breath, and sore throat were all caused by his exposure to slop oil from [CITGO]." However, Dr. Springer's opinion of Mr. Thierry's exposure did not go beyond his office visit of August 1, 2006.

Based upon the testimony and medical evidence in the record on review, we find the trial court was well within its discretion in awarding Mr. Thierry $35,000.00 for pain and suffering, $10,000.00 for fear of future illness associated with exposure, $5,000.00 for loss of enjoyment of life, and $212.00 in medical

expenses associated with his exposure.  Accordingly, we find no merit to CITGO's argument that Mr. Thierry's general damage award was grossly excessive.

Frank Weathersby:

Mr. Weathersby testified at trial that, prior to the releases, he was working for R&R Construction at the CITGO Refinery in maintenance.  After the releases, Mr. Weathersby testified that he worked on the clean-up for over a month and that "once he got on the clean[-]up [he] started working . . . around the clock."  Mr. Weathersby described his work on the clean-up as follows:

> Well, we had shovels and we [were] scooping up the oil.  We would scoop up the oil and throw it in a tank.  We would put it in a wheel barrow and then take it and throw it in a big tank.  And we cleaned up the waterway.  We pulled the booms across the - - skim the oil off the top of the water and cleaned up in the grass and everything, wherever the oil was we would take the pads and we would kind of sop up oil in the grass.

Mr. Weathersby testified that following the releases, he suffered from headaches, dizziness, nose bleeds, stomach aches, and would "cough up blood."  When asked the duration of his symptoms, Mr. Weathersby testified that they "lasted a pretty long time.  I mean, I started having the dizziness and the dizziness started affecting me so bad to where I pretty much had to stop driving because I was running into everybody and haven't had a driver's license since then."  Mr. Weathersby testified that he was still having symptoms resulting from the releases until at least April 2007, which was ten months after the oil spill.  Although Mr. Weathersby was being treated at the time of the releases and clean-up by his primary care doctor (Dr. John Tassin), for injuries he sustained in an automobile accident, he testified that he chose to see Dr. Springer for his symptoms related to the oil spill.

In regard to his fear of a future illness, Mr. Weathersby testified as follows:

Well, when I first started working at the plant I was - - I was fine. I mean, I didn't have [any] illness or [any]thing. I didn't have [any] warts on my hand. I didn't have [any] boils[2] on me or my - - I mean my lungs [were] fine. Now, you know, every time . . . my lungs just - - my breath just drops a little bit. You know, I start thinking maybe my lungs will collapse right then; or I start worrying about, maybe, you know, every now and then still to today. But I go to the restroom a lot of times and maybe I will pass blood and I start worrying about, well, maybe it might be some kind of cancer. And now I got a boil now. I [saw] the doctor and . . . she said, what we need to do is - - I needed to go to a surgeon or whatever and get him to look at it before just getting it cut out.

Dr. Springer testified at trial that he treated Mr. Weathersby for his symptoms related to the chemical releases on August 19, 2006. At that time, Dr. Springer diagnosed Mr. Weathersby with "accidental poisoning of petroleum fuels or cleaners and allergic rhinitis as well as conjunctivitis. So, he was obviously having upper respiratory problems at that time." Dr. Springer testified that he also performed a Pulmonary Function Test on Mr. Weathersby in April 2007 and that his medical notes reflect, at that time, Mr. Weathersby was still complaining of "dizziness, headaches, eye issues, burning specifically, 'lung problems,' nose bleeds[3] for three months, [and] fatigue."

Based upon the testimony and medical evidence in the record on review, we find the trial court was well within its discretion in awarding Mr. Weathersby $45,000.00 for pain and suffering, $10,000.00 for fear of future illness associated with exposure, $5,000.00 for loss of enjoyment of life, and $350.00 for medical expenses associated with his exposure. Accordingly, we find no merit to CITGO's argument that Mr. Weathersby's general damage award was grossly excessive.

Although CITGO argues on appeal that the trial court abused its discretion in finding that the Plaintiffs suffered general damages for loss of enjoyment of life

---

[2] On cross examination, Mr. Weathersby admitted that he had issues with boils prior to the June 2006 releases.

[3] Dr. Springer's medical notes from April 18, 2007, the day Mr. Weathersby had his Pulmonary Function Test, state that Mr. Weathersby had nose bleeds three times a month.

and mental distress, we re-iterate that our focus is on the total award rather than on awards for each element of damages. *See Pennison,* 167 So.3d 1065. All twelve Plaintiffs testified that they were working at the CITGO Refinery on the day of the releases and continued to work at the refinery throughout the clean-up in areas the slop oil contaminated. All twelve Plaintiffs admitted medical records and testified to injuries (i.e. burning eyes and noses, nausea, sinus issues, headaches, itchy throats, skin rashes) as a result of their exposure to the toxic chemicals in the slop oil and air releases. The trial court listened to the testimony of all parties presented and reviewed the evidence put forth and made a factual finding that the Plaintiffs suffered general damages, including those for loss of enjoyment of life and mental anguish. It is reasonable to conclude that having burning eyes and noses, headaches, nausea, sinus issues, and itchy skin would detrimentally affect one's daily living. Thus, we find that the totality of the record supports the trial court's findings that the Plaintiffs' injuries caused an interruption or alteration to their daily life. The trial court has broad discretion in determining a general damages award and we will not disturb that award.

For the above-mentioned reasons, we amend the trial court judgment to reduce Mr. Mayes' medical expenses associated with his exposure from $614.00 to $200.00 and, in all other respects, we affirm the trial court judgment as amended. Costs of these proceedings are assessed to Appellant, CITGO Petroleum Corporation.

**JUDGMENT AMENDED AND AFFIRMED AS AMENDED.**

23